ACCEPTED
14-15-00086-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
10/30/2015 4:19:45 PM
CHRISTOPHER PRINE
CLERK

No. 014-15-00086-CV

_____

IN THE
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
10/30/2015 4:19:45 PM
CHRISTOPHER A. PRINE
Clerk

_____

**AMERIGROUP TEXAS, INC.**

*Appellant*

**v.**

**TRUE VIEW SURGERY CENTER, L.P., d/b/a
TOWN PARK SURGERY CENTER**

*Appellee*

_____

**BRIEF OF APPELLEE**

_____

**Strasburger & Price, LLP**
CHARLES "SCOTT" NICHOLS
State Bar No. 14994100
JACK G. CARNEGIE
State Bar No. 03826100
909 Fannin Street, Suite 2300
Houston, Texas 77010
Telephone: (713) 951-5600
Facsimile: (713) 951-5660
scott.nichols@strasburger.com
jack.carnegie@strasburger.com
ATTORNEYS FOR APPELLEE

Appeal from Cause No. 2012-73820, in the
157th Judicial District of Harris County,
Texas

**ORAL ARGUMENT REQUESTED**

2155944.4/SPH/27768/0101/103015

# TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS ............................................................................................i

TABLE OF AUTHORITIES .....................................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ...............................................ix

NOTE REGARDING RECORD CITATIONS ........................................................ix

ISSUES PRESENTED..............................................................................................x

I.      STATEMENT OF FACTS .............................................................................1

II.     SUMMARY OF ARGUMENT........................................................................6

III.    ARGUMENT AND AUTHORITIES .............................................................9

        A.      Standard of Review ............................................................................9

        B.      Amerigroup's Claims Are Barred By The Statute Of Frauds.............10

                1.      The sole basis for Amerigroup's claims is an alleged oral
                        agreement. .................................................................................11

                2.      Town Park has never admitted that the contract alleged
                        by Amerigroup, or anything remotely similar, exists. ..............18

                3.      The agreement alleged by Amerigroup is barred by the
                        statute of frauds because a contract "relating to medical
                        care" made by a "health care provider" must be in
                        writing. ......................................................................................21

                        (a)     Town Park is a "health care provider." ..........................21

                        (b)     The alleged oral agreement "relates to medical
                                care." ................................................................................22

                        (c)     Amerigroup's attempts to avoid the statute of
                                frauds fail. ........................................................................24

                                (i)     Amerigroup ignores the plain language of
                                        the statute...............................................................24

                                (ii)    Amerigroup has no "history" or case law
                                        supporting its argument.........................................27

2155944.4/SPH/27768/0101/103015

|  |  | (iii) | Town Park's argument does not lead to "absurd results." | 28 |

(iv)    Amerigroup's "performance" is inconsistent with the alleged oral agreement. .......................31

(v)    Town Park's invoices do not satisfy the statute of frauds. ..................................33

(vi)    Amerigroup's "voidable, not void" argument is frivolous...........................34

4.    The agreement alleged by Amerigroup involves an alleged promise by one to answer for the debt of another and is therefore barred by the statute of frauds........................35

(a)    Amerigroup was answering for the debt of another.......36

(b)    The "leading object" doctrine does not apply. ...............37

C.    Amerigroup Cannot Recover Because the Alleged Agreement Was Not Entered Into by Someone With Actual or Apparent Authority to Make a Blanket Fee Agreement On Behalf of Town Park. ........................................39

1.    The burden of proof was on Amerigroup to prove actual or apparent authority. ..............................40

2.    Amerigroup presented no evidence that the unidentified person who supposedly entered into the alleged blanket fee agreement had actual or apparent authority to do so on behalf of Town Park...........................42

(a)    No evidence of actual authority......................42

(b)    No evidence of apparent authority. ...............45

D.    Amerigroup Cannot Recover For Breach Of Contract Because Town Park Did Not Fail To Comply With Any Alleged Contract Term...........................................50

1.    The alleged agreement does not address reimbursement of overpayments........................................50

2.    The alleged agreement does not address billing methodology........................................51

E.    The Trial Court Did Not Err in Granting Summary Judgment Based on the Statute of Limitations as to the Additional 109 Claims on Which Amerigroup First Sought Recovery in 2014.........54

ii

2155944.4/SPH/27768/0101/103015

F.     Amerigroup Has Abandoned Its Equitable Causes of Action and Waived Any Claimed Error in Granting Summary Judgment on Those Causes of Action. ................................................56

G.     The Trial Court Did Not Err in Granting Summary Judgment on Amerigroup's Equitable Claims Based on the Statute of Limitations....................................................................................57

       1.     Unjust enrichment and money had and received are governed by the two-year statute of limitations. ......................57

       2.     The statute of limitations began to run when the money was paid.....................................................................................59

IV.     CONCLUSION AND PRAYER ....................................................60

CERTIFICATE OF COMPLIANCE......................................................61

CERTIFICATE OF SERVICE ...............................................................62

2155944.4/SPH/27768/0101/103015

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*,
201 S.W.3d 349 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ...................42

*American Bank & Trust Co v. Freeman*,
560 S.W.2d 444 (Tex. Civ. App.—Beaumont 1977, writ ref'd n.r.e.)..............41

*Amoco Prod. Co. v. Smith*,
946 S.W.2d 162 (Tex. App. – El Paso 1997, no pet.) .........................................59

*Banfield v. Davidson*,
201 S.W. 442 (Tex. Civ. App.—Galveston 1918, no writ)...............................35

*Buck v. Blum*,
130 S.W.3d 285 (Tex. App. – Houston [14th Dist.] 2004, no pet.) ...................26

*Capstone Healthcare Equipment Services, Inc. v. Quality Home Health
Care, Inc.*,
295 S.W.3d 696 (Tex.App.-Dallas 2009, pet. denied) .......................................55

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) .................................................................................9

*Cohen v. McCutchin*,
565 S.W.2d 230 (Tex. 1978) .........................................................................11, 33

*Cooper Petroleum Co. v. LaGloria Oil & Gas Co.*,
436 S.W.2d 889 (Tex. 1969) ...............................................................................38

*Cox Engineering, Inc. v. Funston Mach. and Supply Co.*,
749 S.W.2d 508 (Tex. App.—Fort Worth, 1988, no writ)................................33

*Dracopoulas v. Rachal*,
411 S.W.2d 719 (Tex. 1967) ...............................................................................20

*Dynegy, Inc. v. Yates*,
345 S.W.3d 516 (Tex. App.—San Antonio 2011, pet. granted), *rev'd on
other grounds*, 422 S.W.3d 638 (Tex. 2013)....................................................35

iv

*Dynegy, Inc. v. Yates*,
422 S.W.3d 638 (Tex. 2013) ...............................................................35

*Eland Energy, Inc. v. Rowan Oil & Gas, Inc.*,
914 S.W.2d 179 (Tex. App.—San Antonio 1995, writ denied) ........................34

*Elledge v. Friberg-Cooper Water Supply Corp.*,
240 S.W.3d 869 (Tex. 2007) ...............................................................58

*Evans v. Shaw*,
268 S.W. 1037 (Tex. Civ. App.—Waco 1925, no writ)...................................35

*Exxon Corp. v. Breezevale, Ltd.*,
82 S.W.3d 429 (Tex. App.—Dallas 2002, pet. denied)......................................32

*First Nat. Bank v. Slaton Independent School Dist.*,
58 S.W.2d 870 (Tex.Civ.App. –Amarillo 1933, writ dism'd)............................41

*Four Seasons Nursing Center v. Weber Medical Systems, LLC*,
04-74614 (E. D. Mich. September 28, 2005) ......................................................26

*Gaffar v. Kamal,*
No. 05-10-00560-CV, 2011 Tex. App. LEXIS 5714 (Tex. App.-Dallas
July 27, 2011, no pet.)..........................................................................59

*Gaines v. Kelly*,
235 S.W.3d 179 (Tex. 2007) ...............................................................46

*Haas Drilling Co. v. First Nat'l Bank*,
456 S.W.2d 886 (Tex. 1970) ...............................................................38

*Hancock v. Chicago Title Ins. Co.*,
635 F.Supp.2d 539 (N.D. Tex. 2009) ...................................................58

*Hermann Hosp. v. MEBA Medical & Benefits Plan*,
845 F.2d 1286 (5th Cir. 1988) ....................................................19, 30

*IRA Res., Inc. v. Griego*,
221 S.W.3d 592 (Tex. 2007) ...............................................................41

*Jeffery v. Walden*,
899 S.W.2d 207 (Tex.App. —Dallas 1993), *rev'd in part on other
grounds*, 907 S.W.2d 446 (Tex. 1995) ............................................25

2155944.4/SPH/27768/0101/103015

*Kinney v. Palmer*,
No. 04-07-00091-CV, 2008 Tex. App. LEXIS 4632; 2008 WL 2515696
(Tex. App. – San Antonio 2008, no pet.).........................................................56

*Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*,
183 S.W.3d 891 (Tex. App.—Austin 2006, no pet.)...........................................26

*LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*,
298 F.3d 348 (5th Cir. 2002) ..............................................................................31

*Lincoln Nat. Life Ins. v. Brown Schools*,
757 S.W.2d 411 (Tex. Civ. App.—Houston [14th Dist.]
1988, no writ).........................................................................................30, 31, 51

*Lippincott v. Whisenhunt*,
462 S.W.3d 507 (Tex. 2015) ...............................................................................28

*Mercer v. Daoran Corp.*,
676 S.W.2d 580 (Tex. 1984) ...............................................................................19

*Merry Homes, Inc. v. Luc Dao*,
359 S.W.3d 881 (Tex. App.-Houston [14th Dist.] 2012, no pet.) ................58, 59

*Mission Linen Supply, Inc. v. Sandy's Signals, Inc.*,
2-07-014-CV, 2007 Tex. App. LEXIS 5968; 2007 WL 2152070 (Tex.
App.-- Fort Worth, July 26, 2007)......................................................................41

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374, 112 S.Ct. 2031 (1992)..................................................................26

*Rakowski v. Committee to Protect Clear Creek Village Homeowners' Rights*,
252 S.W.3d 673 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) ...............19

*Robertson v. Melton*,
131 Tex. 325, 115 S.W.2d 624, 118 A.L.R. 1505 (1938) ..................................20

*Rourke v. Garza*,
530 S.W.2d 794 (Tex. 1975) ...............................................................................46

*Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*,
490 S.W.3d 790 (Tex. App.—Dallas 2013, no pet.) .....................................31, 32

*Sw. Elec. Power Co. v. Grant*,
73 S.W.3d 211 (Tex. 2002)................................................................................9, 10

vi

*Tanglewood Terrace, Ltd. v. City of Texarkana,*
   996 S.W.2d 330 (Tex. App.-Texarkana 1999, no pet.) ....................................59

*Tenaska Frontier Partners, Ltd. v. Sullivan,*
   273 S.W.3d 734 (Tex.App.-Houston [14th Dist.] 2008, no pet.) .......................27

*Texas Dept. of Public Safety v. Abbott,*
   310 S.W.3d 670 (Tex.App.-Austin 2010, no pet.)..............................................26

*TGS-NOPEC Geophysical Co. v. Combs,*
   340 S.W.3d 432 (Tex. 2011) ............................................................................28

*Thomas Reg'l Directory Co., v. Dragon Prods., Ltd.,*
   196 S.W.3d 424 (Tex. App.—Beaumont 2006, pet. denied) .......................45, 46

*Tran v. Luu,*
   No. 12-06-19,092-CV, 2014 Tex. App. LEXIS 3956; 2014 WL 1410345
   (Tex. App. -- Waco 2014, no pet.)....................................................................56

*Verizon Employee Benefits Committee v. Frawley,*
   655 F.Supp.2d 644 (N.D. Tex. 2008) .................................................................59

*Verizon Employee Benefits Committee v. Frawley,*
   No. 3:05-CV-2105-P ECF, 2007 WL 2051113 (N.D. Tex. 2007) ....................59

*Walker Ins. Servs. v. Bottle Rock Power Corp.,*
   108 S.W.3d 538 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ..................42

*White v. Harrison,*
   390 S.W.3d 666 (Tex. App.--Dallas 2012, no pet.)...........................................20

*Williams v. Unifund CCR Partners,*
   264 S.W.3d 231 (Tex. App.—Houston [1st Dist.] 2008, no pet.).....................50

*York Group, Inc. v. Horizon Casket Group, Inc.,*
   2007 U.S. Dist. LEXIS 49778 (S.D. Tex. July 10, 2007) ..................................34

**STATUTES**

29 U.S.C. § 1132(a)(1)(B) ...................................................................................29, 31

Tex. Bus. & Com. Code Ann. § 2.201.....................................................................33

Tex. Bus. & Com. Code § 26.001 ...........................................................................33

vii

TEX. BUS. & COM. CODE § 26.001(a)................................................................10

TEX. BUS. & COM. CODE § 26.01(a)(1)............................................................35

TEX. BUS. & COM. CODE § 26.01(b)(2)..........................................x, 8, 11, 35, 36, 37

TEX. BUS. & COM. CODE § 26.01(b)(8)........................... x, 8, 11, 21, 24, 25, 26, 27

TEX. CIV. PRAC. & REM. CODE § 16.003(a) ..........................................................57

TEX. CIV. PRAC. & REM. CODE § 16.004........................................................54, 58

TEX. CIV. PRAC. & REM. CODE §74.001.................................................................26

TEX. CIV. PRAC. & REM. CODE § 74.001(11)(A) ...............................................22

TEX. CIV. PRAC. & REM. CODE § 74.001(12)....................................................22, 25

TEX. CIV. PRAC. & REM. CODE § 74.001(19)....................................................22, 23

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)......................................................26

TEX. CIV. PRAC. & REM. CODE§ 16.068.........................................................54, 55

TEX. OCC. CODE § 151.002 .............................................................................22, 23

TEX. OCC. CODE § 151.002(13) ...........................................................................23

**RULES**

TEX. R. CIV. P. 65 ................................................................................................56

Tex. R. Civ. P. 166a(i) ..........................................................................................9

Tex. R. Civ. P. 166a(c)..........................................................................................10

2155944.4/SPH/27768/0101/103015

## STATEMENT REGARDING ORAL ARGUMENT

Appellee, Town Park, respectfully submits that oral argument is unnecessary. The facts and law are straightforward. Amerigroup alleges Town Park orally agreed to accept a particular amount for certain a medical procedure performed on Amerigroup's policyholders and breached by failing to reimburse supposed overpayments. There was no such agreement. But even if there were, (1) the alleged agreement would be unenforceable under the statute of frauds; (2) there was no evidence the alleged agreement was entered into by anyone with authority to enter into such a blanket fee agreement; (3) there is no allegation or evidence that the alleged agreement included a term requiring reimbursement of overpayments; therefore it would not be a breach of contract to fail to return claimed overpayments. Any potential remedies would be equitable and those have been abandoned and are barred by the statute of limitations.

## NOTE REGARDING RECORD CITATIONS

A number of the materials were filed in the trial court under seal. The original Clerk's Record did not contain the sealed materials and had to be supplemented. As a result, the record is somewhat fragmented.

For example, Appellee's Second Motion for Summary Judgment at issue in this appeal is located at CR 501, but only with Exhibits A, C and D. The motion is also located in the Supplemental Clerk's Record beginning in Volume III, p. 165, with Exhibits B, E, and G in Volume IV, p. 190-250, and Exhibits F and H in

2155944.4/SPH/27768/0101/103015

Volume V, p. 259-264. Similarly, Appellee's first Motion for Summary Judgment is located at CR 127 with Exhibits A, D, E, F and G, and in the Supplemental Clerk's Record beginning in Volume I, p. 16, with Exhibits B and C at Volume II p. 30-82.

Appellee has attempted to include citations to all relevant portions of the record to assist the Court in identifying the complete documents.

## ISSUES PRESENTED

Did the trial court err in granting summary judgment in favor of Town Park?

Does the alleged oral agreement for Amerigroup to pay, and Town Park to accept, a certain dollar amount for Town Park's facilities fee for a particular surgical procedure constitute an "an agreement, promise, [or] contract … relating to medical care … made by a … health care provider as defined in Section 74.001, Civil Practice and Remedies Code," such that it falls within the Statute of Frauds, TEX. BUS. & COM. CODE § 26.01(b)(8)?

Does the alleged verbal agreement for Amerigroup to pay, on behalf of its insureds, Town Park's facilities fee for services rendered to those insureds, constitute "a promise by one person to answer for the debt … of another person" (*i.e.* the patients to whom the services were rendered) such that it falls within the Statute of Frauds, TEX. BUS. & COM. CODE § 26.01(b)(2)?

Did Amerigroup present sufficient evidence to raise a genuine issue of material fact as to whether the unidentified person who supposedly entered into the

2155944.4/SPH/27768/0101/103015

alleged verbal agreement on behalf of Town Park had actual or apparent authority to enter into a blanket fixed fee agreement for an indefinite term?

When a party pays less than the amount charged, but later contends that it mistakenly paid more than it intended to pay, is it a breach of contract for the other party to fail to refund the alleged overpayment when there is no contractual term addressing reimbursement of alleged overpayments?

Are plaintiff's breach of contract claims barred by the four year statute of limitations to the extent they relate to individual payments made for particular patients more than four years before the claims were added to the lawsuit?

Did plaintiff abandon all claims other than breach of contract, and waive any claimed error in granting summary judgment on those other claims, by filing an amended pleading that included no causes of action except breach of contract?

Are plaintiff's claims for equitable relief barred by the two-year statute of limitations?

2155944.4/SPH/27768/0101/103015

## I.  STATEMENT OF FACTS

Amerigroup Texas, Inc. ("Amerigroup") is a publicly-traded, for-profit health maintenance organization that has contracted with the Texas Health & Human Services Commission, or "Texas Medicaid," to manage payments for members' healthcare services.  Because Amerigroup is a for-profit entity, Amerigroup alone, and not Texas Medicaid, determines the amount it pays on any given claim. While Amerigroup may opt to use the Medicaid fee schedule as a guide for reimbursements, it is under no obligation to do so and its decision of how much to pay has no effect on Medicaid or the taxpayers.  Supp. CR 62-63 (Second MSJ, Ex. B at p. 116. ll. 20-25, p. 117, ll. 1-22).  Amerigroup reimburses different providers for the same services at rates that differ from the Medicaid fee schedule and differ among providers.  Supp. CR 59-60 (Second MSJ, Ex. B at p. 110, ll. 1-7, p. 111, ll. 1-21).

True View Surgery Center, L.P. d/b/a Town Park Surgery Center ("Town Park") is a licensed ambulatory surgical center that furnishes the facility services where various medical procedures are performed, including the dental surgery procedures at issue in this case.  Supp. CR 259, 262 (Second MSJ at Ex. F).  These services include arranging the anesthesiologists' services and providing the operating room, labs, supplies, and nursing—essentially everything except the dentist's services.  Supp. CR 66-67 (Second MSJ at Ex. B at p. 127, ll. 1- 17, p. 128, ll. 1- 2).

1

Generally speaking, health care providers, including both doctors and facility providers like Town Park, can be characterized as being "in-network" or "out-of-network." It is important to understand this distinction. An "in-network" provider is one that has contracted with a health insurer like Amerigroup to accept pre-agreed amounts for particular services. Although an in-network provider typically agrees to accept a discounted rate, it benefits by receiving an increased volume of procedures.

An out-of-network provider has no contract with the insurer to accept a pre-agreed rate for particular services, and invoices at its own chosen rate for services rendered. That is not to say insurers *pay* the provider's invoiced rate; the amount insurers pay for services rendered to their insureds by out-of-network providers is based on the terms of the insurance plan with the insureds, and not on any contractual agreement with the provider.

It is undisputed that Town Park was out-of-network with Amerigroup; Town Park had not contracted to accept a pre-agreed rate. *See* Appellant's Br. at 6-7.

Between 2006 and 2010, a number of Amerigroup policyholders underwent dental surgery at Town Park. The procedure was referred to as the "41899" procedure, after the procedure code assigned to it.[1] Amerigroup alleges that the

---

[1] CR 527 (Ex. A at ¶ 8). 41899 is the code for "unlisted procedure, dentoalveolar structures," which for these claims means dental surgery including the treatment of teeth and sometimes treatment of abscess and replacement with implants. The procedures for these claims were performed by a dental surgeon, the patients required anesthesia, and they occurred in a surgery center which provided the nursing care, among other things.

2

41899 procedures were performed by several dentists, and that Dr. Patrick Ralph performed the majority of the procedures at issue. CR 527, Supp. CR 64-65 (Second MSJ at Ex. A at ¶ 8; Ex. B at p. 123, ll. 23 – 25, p. 124, ll. 1 – 7). Town Park furnished the facility services necessary for the procedures to be performed.

Town Park had its patients sign a Patient Authorization & Responsibility Form under which the patients acknowledged that they were financially responsible for the charges, but Town Park billed Amerigroup directly. Supp. CR 259-61. Town Park's billed charges ranged from $6000 to $9000 per procedure and Town Park submitted its invoices directly to Amerigroup. Amerigroup then determined the amount payable.

Amerigroup never paid Town Park's full billed charges. Instead, it reimbursed Town Park anywhere from $1,800 to $4,800 less than Town Park's invoices. According to Amerigroup's latest petition, 239 of Amerigroup's insured members underwent the "41899" dental procedure from December 21, 2008 through September 2010, and Amerigroup paid $4,200.00 for 25 patients, $5040 for one patient, $6,142.50 for 18 patients and $6300 for the remaining 194 patients. CR 497 (Fourth Amended Petition ¶11). Around the same time, however, Amerigroup's average per-claim payment to another provider for the same 41899 code was $12,820. Supp. CR 58-59 (Second MSJ at Ex. B at p. 108, ll. 8-10, p. 110, ll. 5-13).

2155944.4/SPH/27768/0101/103015

On March 21, 2011, long after the original claims and reimbursements, Amerigroup began sending letters to Town Park demanding that Town Park refund most of what it had been paid for the procedures during the prior three years. Amerigroup vaguely claimed the amounts had been "paid in error." *See, e.g.*, CR 13, 18, 23, 28. None of the letters claimed that there had been any prior agreement by Town Park to accept a particular pre-agreed rate for its services in connection with the 41899 procedures. On the contrary, Amerigroup recognized that Town Park was a "non-participating [*i.e.* out-of-network] facility." CR 28.

On December 18, 2012, Amerigroup filed suit against Town Park claiming that, "due to a clerical oversight," it had overpaid Town Park for 130 "41899" procedures. CR 2-3, 7-8. Amerigroup alleged that "[t]he '99' code indicates a nonspecific code, which only requires reimbursement off the state fee schedule," and sought to recoup all but $611 per procedure. *Id.* While the Original Petition alleged that "Amerigroup reimbursed Town Park at this reduced flat rate for years," the reality is that Amerigroup had never reimbursed Town Park based on the Medicaid fee schedule. Supp. CR 44-45 (Ex. B p. 29, ll. 1-16, p. 30, l. 1.) In fact, from 2006 through the end of 2008, the time period pre-dating the claims at issue in this suit, Amerigroup typically reimbursed Town Park anywhere from $3412 to $6142. *See* Supp. CR 1059.[2]

---

[2] Reimbursements generally increased over time as one might expect due to inflation.

4

By its Third Amended Petition, Amerigroup sought to recover all but $630 per procedure and had modified its legal theories to include breach of contract, money had and received, recoupment, and unjust enrichment. CR 100-103.

Town Park moved for summary judgment in January 2014 contending, among other things, that Amerigroup's unjust enrichment and money had and received claims were barred by the statute of limitations, and that its claim for recoupment failed because Town Park had not sued Amerigroup for damages against which Amerigroup's claims may be offset. CR 127. *See also* Supp. CR. 16 (MSJ), Supp. CR. 31, 81 (Exhibits B and C), CR 291 (Reply to Response). The trial court granted partial summary judgment on the unjust enrichment and money had and received claims, and noted that Amerigroup had withdrawn its recoupment claim. CR 327. This left only Amerigroup's breach of contract claim.

On November 14, 2014, Amerigroup filed its Fourth Amended Petition eliminating all causes of action except breach of contract, but adding another 109 claims dating back to December 2008. CR 495. The same day, Town Park filed a Third Amended Answer adding additional affirmative defenses. CR 492. By this point, Amerigroup claimed that, at some unknown time "before September 2009," some unidentified person at Town Park verbally agreed by telephone to accept 100% of the Medicaid reimbursement rate for the 41899 procedures on patients covered by Amerigroup, but that on 239 separate occasions between 2008 and

5

2010, Amerigroup "mistakenly reimbursed Town Park at an inflated rate …." CR 496-97 (Fourth Amended Petition ¶¶ 9, 11).

Town Park then filed its Second Motion for Summary judgment addressing Amerigroup's breach of contract claim. CR 501 (with Exhibits A, C and D). *See also* Supp. CR 165; Supp. CR 190-250 (sealed Exhibits B, E, and G); Supp. CR 250-265 (Exhibits F-H); CR 594 (reply to response). After an oral hearing, the court granted summary judgment. CR 641.

## II.    SUMMARY OF ARGUMENT

Amerigroup's claims are founded solely on an alleged oral agreement for Amerigroup to pay, and Town Park to accept, 100% of the Medicaid rate for all 41899 procedures performed on patients insured by Amerigroup. There was no such agreement. CR 538 (Ex. B); Supp. CR 254-55 (Ex. G at p. 211, ll. 15, p. 212, ll. 15). While Amerigroup consistently reimbursed Town Park anywhere from $1,800 to $4,800 less than the amount Town Park invoiced, Amerigroup never paid the amount it now claims was agreed. Supp. CR 44-45 (Ex. B p. 29, ll. 1-16, p. 30, l. 1.) Thus, this is not a case of a few "mistaken overpayments."

By Amerigroup's own account, the single telephone call during which the agreement allegedly was made originated simply to obtain authorization for one dental surgeon, Dr. Ralph, to perform a single procedure on a single patient on a single date of service. Supp. CR 231, 234 (Ex. E at p. 38 ll. 3-23, p. 41, ll. 9-13). The call was not initiated to obtain a blanket agreement to accept Medicaid rates.

6

Supp. CR 231, 234 (Ex. E at p. 38 ll. 3-23, p. 41, ll. 9-13). Somehow Amerigroup contends this alleged conversation, which took place at an unknown time with an unknown person at Town Park, created a blanket contract for Town Park to accept the Medicaid rate for all 41899 procedures for the indefinite future.

Amerigroup has no idea when the alleged telephone call took place. It has no documentation of the supposed agreement. Supp. CR 222 (Second MSJ at Ex. B at p. 188, ll. 1-6.) And, although Amerigroup sued to recover payments as far back as December 2008, its petition vaguely alleged only that the agreement was made "[s]ometime before September 2009." CR 496 (Fourth Amended Petition ¶9). Amerigroup witnesses, however, could not even state what year the supposed agreement was made. Supp. CR 230-31 (Second MSJ at Ex. E at p. 37 ll. 1 - 25, p. 38 ll. 1 - 3.)

Amerigroup also has no idea who made this supposed agreement on behalf of Town Park. Not only is it unable to identify the person by name, it cannot state the position or title of the person, or even the department where he supposedly worked. Supp. CR 230-31, 243 (Second MSJ at Ex. E at p. 37 ll. 1 - 25, p. 38 ll. 1 – 3, p. 100 ll. 4-16.).

Thus, there is no evidence that the alleged agreement exists or was made by someone with authority at Town Park to enter into a blanket fee agreement. Even if such an agreement had been made, however, it would be unenforceable under two separate provisions of the statute of frauds.

7

First, the alleged agreement is one made by a health care provider relating to medical care. Such agreements fall within the statute of frauds, and fail as a matter of law when there is no written memorandum complete in every material detail signed by the party to be charged. TEX. BUS. & COM. CODE § 26.01(b)(8). There is no such written document.

Second, Town Park rendered services to its patients and payment for those services was owed by the individual patients. An alleged agreement for Amerigroup to pay the debt of another (*i.e.* the patients) also falls within the statute of frauds. TEX. BUS. & COM. CODE § 26.01(b)(2).

Amerigroup's claim is also precluded because the alleged agreement was not made by anyone with actual or apparent authority to make such an agreement. The only person with authority to make a blanket agreement to accept a particular rate for specified procedures was Mr. Kraig Killough, who testified that he made no such agreement. Supp. CR 254-55 (Ex. G at p. 211, ll. 15, p. 212, ll. 15). Amerigroup cannot refute that testimony because none of Amerigroup's witnesses could identify who supposedly made the alleged agreement on behalf of Town Park. Thus, even assuming someone purported to make such an agreement, it was not someone with actual or apparent authority to do so.

Amerigroup's breach of contract claim also fails for other equally fundamental reasons. The only claimed breach is Town Park's failure to reimburse the alleged mistaken overpayments, yet there is no allegation or evidence of any

8

contract term addressing reimbursement of overpayments. (Notably, in-network agreements often do contain such terms, but the oral agreement alleged by Amerigroup does not.) In the absence of such a contract term, the failure to reimburse overpayments is not a breach of contract as a matter of law.

At best, Amerigroup would be relegated to equitable theories for recovering claimed mistaken overpayments. Amerigroup, however, abandoned its equitable legal theories, and waived any claimed error in granting summary judgment on those causes of action, when it eliminated them from its Fourth Amended Petition. Even apart from the abandonment, those causes of action are barred by the statute of limitations in any event.

## III. ARGUMENT AND AUTHORITIES

### A. Standard of Review

A defendant is entitled to summary judgment on no-evidence grounds if there is no evidence of an essential element of the plaintiff's claims. *See* Tex. R. Civ. P. 166a(i); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). An appellate court will affirm a no-evidence summary judgment if the record shows: (1) there is no evidence on the challenged element; (2) the evidence offered to prove the challenged element is no more than a scintilla; (3) the evidence establishes the opposite of the challenged element; or (4) the court is barred by law or the rules of evidence from considering the only evidence offered to prove the challenged element. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

9

A defendant is entitled to summary judgment on traditional grounds if it conclusively negates an essential element of each of the plaintiff's causes of action. *See* Tex. R. Civ. P. 166a(c); *Grant*, 73 S.W.3d at 215.

**B.     Amerigroup's Claims Are Barred By The Statute Of Frauds.**

Town Park never verbally agreed to accept Medicare rates for all 41899 procedures as alleged by Amerigroup.  But even if there were such an agreement, it would be barred by the statute of frauds.

Section 26.001(a) of the Business & Commerce Code states:

**§ 26.01. Promise Or Agreement Must Be In Writing**

(a)     A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1)     in writing; and

(2)     signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

TEX. BUS. & COM. CODE ANN. §26.01(a).  Section (b) of the statute describes the types of contracts that must be in writing.  Subsections b(2) and b(8) apply here. Those sections state:

(b)     Subsection (a) of this section applies to:

* * *

(2)     a promise by one person to answer for the debt, default, or miscarriage of another person;

* * *

10

(8)      an agreement, promise, contract, or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in Section 74.001, Civil Practice and Remedies Code.  This section shall not apply to pharmacists.

TEX. BUS. & COM. CODE § 26.01(b)(2), (8).

Subsection (b)(2) applies because Amerigroup alleges an agreement between Amerigroup and Town Park under which Amerigroup is to pay Town Park specified amounts owed to Town Park by its patients.  Thus Amerigroup alleges an agreement to answer for the debt of another, specifically the debt the individual patients owed to Town Park for services provided to those patients.

Subsection (b)(8) applies because the claim is based on "an agreement [or] contract … relating to medical care … made by a … health care provider as defined in Section 74.001, Civil Practice and Remedies Code."  Town Park is a "health care provider" and the alleged contract clearly relates to medical care; specifically, the 41899 dental surgeries.

> **1.      The sole basis for Amerigroup's claims is an alleged oral agreement.**

To satisfy the statute of frauds, "there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony."  *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978).   In the present case, there is no written

11

memorandum of the alleged agreement, much less a writing sufficient to satisfy this standard.

The testimony of Amerigroup's Corporate Representative, Edmund Chidester, as well as its witness Nancy Jones, the individual who allegedly had the conversation underlying Amerigroup's claims, is crystal clear that the supposed agreement to accept Medicaid rates was entirely verbal.[3] As told by Ms Jones, the agreement was made in a single telephone call with an unidentified person, after Dr. Ralph requested authorization to perform a procedure at Town Park. Supp. CR. 231 (Ex. E at p. 38 ll. 3-23). She testified that the alleged agreement "originated from an authorization for a single procedure for a single patient on a single date of service." Supp. CR. 233 (Ex. E at p. 41, ll. 9-13). Amerigroup contends this lone conversation established an agreement to accept the specified Medicaid rate for all patients in the future.

Specifically, Jones testified that she first spoke with Dr. Ralph's employee "Rose" about Dr. Ralph's request for authorization to perform surgery at Town Park, and asked Rose if Town Park accepted Medicaid rates. Supp. CR. 232 (Ex. E at p. 39, ll. 2-12). Rose said she did not know and referred Jones to "JoAnn" at Town Park. *Id.* at p. 39, ll. 13 - 20. Jones testified she then called JoAnn and asked if Town Park accepted Medicaid rates. JoAnn told her that was not within

---

[3] *See generally*, Supp. CR. 190, 224 (Ex. B and E; Depositions of Edmund Chidester and Nancy Jones).

2155944.4/SPH/27768/0101/103015

"her scope" and referred Jones to another person. Supp. CR. 233-34 (Ex. E at p. 40, l. 16 – 41, l. 5). Jones said she then called "that other person" and explained what she needed to find out. *Id.* at p. 41, ll. 6-13. Jones, however, could not identify the other person:

> Q. Okay. And so it's your testimony that on one occasion you had a conversation with somebody at Town Park Surgery Center and that person accepted the Texas Medicaid fee schedule and you documented that?
>
> A. Yes.
>
> Q. Do you know the person's name?
>
> A. I don't remember.

Supp. CR. 228 (Ex. E at p. 34, ll. 9-15). Although Jones claimed she documented the conversation, Amerigroup's corporate representative testified he had not been able to locate any such documentation. Supp. CR 43-44 (Ex. B. at p. 28, l. 18 – 29, l. 3). Jones described the conversation with the "other person" as follows:

> Q. You don't remember the exact conversation [with the "other person"]?
>
> A. I remember explaining who I was with and that we had a request for surgery -- for dental surgery to be done at Town Park. I said, "I need to find out if you-all would accept the Texas Medicaid fee schedule." He agreed. We had a few seconds in there where he verbalized his gratitude that we were able to work something out and to be able to approve the request coming from Dr. Ralph because they were dealing with him quite a bit. That's about all I remember about a telephone call.
>
> Q. Okay. And so the call originated because you had gotten a request from Dr. Ralph --
>
> A. Right.

13

Q. -- for authorization to do the procedure at Town Park Surgery Center?

A. Right.

Q. Is that correct?

A. Yes.

Supp. CR 231 (Ex. E at p. 38, ll. 4-23).

Q. All right. And then tell me what you told him [the "other person"].

A. Well, I explained who I was and that I needed to find out if they would accept the Texas Medicaid fee schedule. I needed to know that before proceeding any further as to *needing a single case rate agreement*. And he said that, "No, they would accept 100 percent of Medicaid rates." Normally, the thing is a 100 percent Medicaid fee schedule minus the service area discount. I always left that service area discount off.

Q. So instead of 95 percent, you were giving them 100 percent?

A. Right.

Supp. CR 234-35 (Ex. E at p. 41, l. 19 – 42, l. 6) (emphasis added).

Thus, by Jones' own testimony, the alleged call was only to obtain "a single case rate agreement," not a blanket rate agreement for the indefinite future. There is no evidence that there was a meeting of the minds, or understanding on Town Park's part, that this alleged conversation related to anything more than a single procedure, or even that the unidentified person with whom Ms Jones supposedly spoke would have authority to establish a broader agreement.

Jones went on to testify that this was the only conversation she recalled "regarding the rates at which Amerigroup would reimburse Town Park":

14

Q. I mean, your statement [in your affidavit] leaves open the possibility there is only one [conversation with the "other person"]. I just want to clarify. It says "After this preliminary agreement was reached, there were not many, if any, additional conversations between me and Town Park regarding the rates at which Amerigroup would reimburse Town Park."

A. I was going on memory. I know I had the first conversation with them. I don't know when I would have had a second conversation with them.

Q. Okay. As we sit here today under oath and for the jury, you remember one conversation?

A. Yes.

Q. And none other?

A. Yes.

* * *

Q. So you have to swear to it, so just one?

A. One.

Supp. CR 240-41 (Ex. E at p. 83, l. 18 – 84, l. 14). Amerigroup's corporate representative Edmund Chidester also testified there was only one such conversation. Supp. CR 49-50 (Ex. B at p. 36, l. 13 – 37, l. 15).

Chidester admitted Amerigroup's entire suit was based on this supposed verbal agreement between Nancy Jones and the unidentified "other person" at Town Park:

Q. … The agreement to accept the flat fee based on a Texas Medicaid fee schedule is based upon what Nancy Jones reports to you about a conversation she had with a man who was supposedly employed by Town Park, whose name she can't remember, one time?

A. Correct.

15

Supp. CR 221 (Ex. B at p. 187, ll. 18 – 25).

Q. Okay. Well, I just want to be clear. If -- if -- if my client did not, in fact, hypothetically accept to be reimbursed at the Texas Medicaid fee rate, then there would be no such basis for your lawsuit, correct?

A. Correct.

Supp. CR 205 (Ex. B at p. 32, ll. 5-10).

Chidester further admitted there was no documentation of the alleged agreement:

Q. All right. You'll agree there's no notation anywhere in the notes about her [Jones'] discussion with an employee from Town Park? Would you agree with that?

A. That's correct.

Q. Okay. So the long-standing agreement between Amerigroup and Town Park is based upon a conversation that Nancy Jones tells you she had with somebody at Town Park who gave the phone to a man who had authority at Town Park --

A. That's correct.

Q. -- is that correct? But that's not documented anywhere; is that correct?

A. It's not in the notes that we looked at today, no.

Q. Is it documented anywhere else that we haven't talked about today?

A. Not that I have seen.

Supp. CR 218 (Ex. B at p. 176, l. 10 – 177, l. 3).

Q. And to the best of our knowledge, based on the review of all the documents, there is no notation in any record regarding his [the "other person's"] name --

A. That's correct.

16

Q. -- or even the agreement, itself, with him [the "other person"]?

A. Correct.

Supp. CR 222 (Ex. B at p. 188, ll. 1-6).

Chidester went on to admit there is no written contract between Amerigroup

and Town Park under which Town Park agreed to accept Medicaid rates:

Q. The -- the request for admissions state, "Admit that Amerigroup and Town Park have never executed a written contract." And Amerigroup's answer was, "Admit to the extent that Amerigroup and Town Park have never executed a Participating Provider Agreement. Otherwise, denied."

And so I think we're in agreement that there was no Participating Provider Agreement between Amerigroup and Town Park, but you've denied it as to any other kind of a contract. Has Amerigroup and Town Park entered into any other kind of contract that you're aware of? Written --

A. No.

Supp. CR 219 (Ex. B at p. 184, ll. 11 – 23).

Q. Okay. And the next one is Request for Admission Number 4. And it states, "Admit that no written contract exists between Amerigroup and Town Park in which Town Park states its agreement to accept a flat fee for the Procedure." And again, you wrote -- or Amerigroup did – "Admit to the extent that Amerigroup and Town Park have never executed a Participating Provider Agreement. Otherwise, denied." Do you see that?

A. I do.

Q. An accurate answer to that request for admission would have just been "admit," correct?

A. Correct.

Supp. CR 220 (Ex. B at p. 185, ll. 8 – 20).

2155944.4/SPH/27768/0101/103015

In summary, Amerigroup's own witnesses, including its Corporate Representative, establish that Amerigroup is basing its lawsuit solely on an alleged telephone conversation between Nancy Jones and an unidentified person allegedly at Town Park to obtain authorization for a single procedure by Dr. Ralph.

## 2. Town Park has never admitted that the contract alleged by Amerigroup, or anything remotely similar, exists.

In its first defense to the statute of frauds, Amerigroup does not dispute the statute of frauds applies, but instead argues the oral agreement is nonetheless enforceable because "Town Park admits a contract exists." Appellant's Br. at 25.

Town Park does not and never has admitted the existence of a contract remotely like the one alleged by Amerigroup in which Town Park supposedly agreed to accept indefinitely the Medicaid rate for all 41899 procedures. Town Park merely acknowledged certain undisputed facts: The 41899 procedures were performed at Town Park's facilities, Town Park submitted invoices for each patient to Amerigroup, Amerigroup tendered amounts that were uniformly lower than Town Park's invoiced amounts, and Town Park accepted those tendered amounts.

Given those facts, one could conceivably argue that a series of individual patient-specific agreements was formed under which Town Park agreed to accept the amount actually tendered in satisfaction of Town Park's invoice for the particular patient. In first-year contract terms, Town Park's invoice might be viewed as an "offer," Amerigroup's tender of a different amount could be viewed

18

as a "counteroffer," and Town Park's acceptance of the amount tendered could be viewed as acceptance of the counteroffer with respect to the particular services rendered to the particular patient. But even assuming that to be the case, the invoices and payments do not constitute "a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement" alleged by Amerigroup. Those documents flatly contradict the agreement alleged by Amerigroup.

Of course, another more legally correct way to construe this exchange of invoices and payments is that no contract was formed; Amerigroup was simply paying pursuant to the terms of its insuring agreement with its members. Town Park accepted the tendered amount precisely because it had no contract under which it could require Amerigroup to pay the full invoiced amount. The fact that the out-of-network provider is not a party to the insuring agreement, or any other contract with the insurer, is why the provider generally lacks standing to sue the insurer without an assignment from the patient. *See Hermann Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286 (5th Cir. 1988).[4]

This Court need not decide whether the exchange of invoices and payments created a series of individual patient-specific contracts because, even assuming it

---

[4] The testimony relied on by Amerigroup for the legal conclusion that there was a "contract or agreement" is "no evidence" and does not raise a fact issue that will defeat summary judgment. *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex. 1984). *Accord Rakowski v. Committee to Protect Clear Creek Village Homeowners' Rights*, 252 S.W.3d 673, 683 n.9 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). Based on *the facts*, the Court can determine the legal issue of whether there is one or more contracts and, if so, what those contracts may be.

19

did, those contracts are nothing like the contract alleged by Amerigroup. Moreover, any such contracts would be within §26.01(b)(2) and (b)(8) of the statute of frauds because they involve Amerigroup paying the patients' debts and because they relate to medical care. Contracts that are within the statute of frauds and required to be in writing may not be orally modified, much less transformed into an entirely different agreement like the contract alleged by Amerigroup; *i.e.* a blanket contract to accept the Medicaid rate for all 41899 procedures for an indefinite time:

> Parties to a written contract that is within the provisions of the statute of frauds:
>
> > "* * * may not by mere oral agreement alter one or more of the terms thereof and thus make a new contract resting partly in writing and partly in parol, the reason for the rule being that, when such alteration is made, part of the contract has to be proven by parol evidence, and the contract is thus exposed to all the evils which the statute was intended to remedy." *Robertson v. Melton*, 131 Tex. 325, 115 S.W.2d 624, 118 A.L.R. 1505 (1938).

*Dracopoulas v. Rachal*, 411 S.W.2d 719, 721 (Tex. 1967). *See White v. Harrison*, 390 S.W.3d 666, 674 (Tex. App.--Dallas 2012, no pet.) ("an oral modification of a written contract is enforceable under the Statute of Frauds only if the modification does not materially alter the obligations imposed by the underlying agreement.")[5]

In the present case, the oral agreement claimed by Amerigroup is undeniably *materially* different than any series of individual patient-specific contracts that

---

[5] There are extremely limited exceptions to this rule, none of which apply here.

2155944.4/SPH/27768/0101/103015

conceivably could have been created by an exchange of invoices and payments; it would require Town Park to refund some 90% of the amounts previously paid by Amerigroup. Thus, the mere exchange of invoices and payments will not allow Amerigroup to circumvent the statute of frauds.

**3. The agreement alleged by Amerigroup is barred by the statute of frauds because a contract "relating to medical care" made by a "health care provider" must be in writing.**

Section 26.01(b)(8) of the statute of frauds bars Amerigroup's claims because Amerigroup seeks to enforce "an agreement . . . relating to medical care … made by a health care provider as defined in Section 74.001, Civil Practice and Remedies Code." *See* TEX. BUS. & COM. CODE § 26.01(b)(8).

**(a) Town Park is a "health care provider."**

Amerigroup does not dispute that Town Park is a "health care provider" as defined by Section 74.001 of the Civil Practice & Remedies Code. Section 74.001(12) defines "health care provider," in part, as follows:

(A) "Health care provider" means any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including:

(i) a registered nurse;

(ii) a dentist;

* * *

(vii) a health care institution….

21

TEX. CIV. P. & REM. CODE § 74.001(12). The term "health care institution" includes "an ambulatory surgery center." TEX. CIV. P. & REM. CODE § 74.001(11)(A). Town Park is an ambulatory surgical center duly licensed, certified, registered and/or chartered by the State of Texas to provide health care. *See* Supp. CR 259, 262 (Ex. F, F-2). Thus, Town Park is a "health care provider" and the alleged oral agreement on which Amerigroup bases its suit is an "agreement … made by a health care provider."

### (b)  The alleged oral agreement "relates to medical care."

The oral agreement alleged by Amerigroup is "an agreement … relating to medical care" because it relates to the dental surgery and anesthesia performed on Amerigroup's insureds, as well as to Town Park furnishing anesthesiologists, nursing, and other medical services, to those patients in connection with those surgeries. This medical care could not have been provided without the facilities and services provided by Town Park.

The Civil Practice & Remedies Code defines "medical care" as follows:

"Medical care" means any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement.

TEX. CIV. P. & REM. CODE § 74.001(19). Thus, for example, the anesthesiologists provided by Town Park were rendering medical care when they provided the anesthesia for the 41899 procedures.

22

Section 151.002 of the Occupations Code defines "practicing medicine":

> "Practicing medicine" means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who:
>
> (A) publicly professes to be a physician or surgeon; or
>
> (B) directly or indirectly charges money or other compensation for those services.

TEX. OCC. CODE § 151.002(13).

The dental surgeons performing the surgeries, the physicians performing the anesthesia for the surgeries under their contract with Town Park,[6] and the nurses and other staff employed by Town Park all are engaged in the "treatment" of a "physical disease or disorder or a physical deformity." These activities fall within the broad definition of "practicing medicine" under TEX. OCC. CODE § 151.002(13), and constitute "medical care" under TEX. CIV. P. & REM. CODE § 74.001(19). The agreement alleged by Amerigroup "relates to" this "medical care" because the services provided by Town Park facilitated this medical care.

Thus, Amerigroup's alleged oral agreement regarding payment for Town Park's services in connection with the 41899 procedures is "an agreement . . .

---

[6] *See* Supp. CR 790-97 (Contract between Town Park and Association Anesthesiologists P.A. to provide "the essential anesthesia services at [Town Park] through its physicians ('Anesthesiologists') for all patients of [Town Park] in support of [Town Park's] operating rooms…".) While the anesthesiologists billed for their services separately, arranging for and providing these anesthesiologists were part of the services Town Park provided.

23

relating to medical care … made by a health care provider" and is unenforceable under § 26.01(b)(8) of the statute of frauds.

### (c) Amerigroup's attempts to avoid the statute of frauds fail.

#### (i) Amerigroup ignores the plain language of the statute.

Unsupported by any authority, Amerigroup argues that §26.01(b)(8) does not apply where "an out-of-network entity … merely provides the facilities … where a third-party physician or surgeon provides medical care."  Appellant's Br. 30.  It concludes that:

> [T]he parties' agreement would only be subject to Section 26.01(b)(8) if someone at Town Park: (i) carried a medical license; (ii) publicly professed to be a surgeon or physician; and (iii) agreed to treat or diagnose an Amerigroup member's disease, disorder, deformity, or injury.

*Id.*  Notably, the anesthesiologists under contract to Town Park who provided the anesthesia for the surgeries fit this description perfectly.  *See* Supp. CR 790-97.  Thus, even under Amerigroup's overly restrictive reading, §26.01(b)(8) applies.

Amerigroup's argument is wrong in any event.

By its terms §26.01(b)(8) does not apply only to licensed physicians; it explicitly applies more broadly to agreements made "made by a physician *or health care provider* …." (Emphasis added).  Amerigroup's argument would render meaningless the statute's broad reference to "health care provider," which includes not only "health care institutions" like Town Park but also, for example,

24

registered nurses, dentists, and optometrists. *See* TEX. CIV. P. & REM. CODE § 74.001(12). Amerigroup's own case law recognizes that §26.01(b)(8) applies to dentists even though they are licensed separately from physicians. *See Jeffery v. Walden*, 899 S.W.2d 207, 212 (Tex.App. —Dallas 1993), *rev'd in part on other grounds*, 907 S.W.2d 446 (Tex. 1995) (applying §26.01(b)(8), and noting that "Texas statutes define dentists as health care providers.")

The statute also expressly states that it "shall not apply to pharmacists." If the statute applied only to licensed physicians, this explicit exclusion of pharmacists would be unnecessary surplusage.

Equally important, §26.01(b)(8) does not require Town Park to *provide* "medical care" itself or "practice medicine" or employ the individuals providing the medical care. It requires only that the alleged contract is one "relating to" medical care. As Amerigroup admits, Town Park provided the operating room, labs, supplies, and nursing, and even arranged the anesthesiologists' services— essentially everything except the dentist's services—for the surgical procedures at issue. Supp. CR 66-67 (Second MSJ at Ex. B at p. 127, ll. 1- 17, p. 128, ll. 1- 2). As matter of law, any agreement for Amerigroup to pay a particular rate for these services, which were essential to perform the surgeries, "relates to" medical care.

The term "relates to" is broadly construed:

> The terminology "relates to" is very broad in its ordinary usage, and
> we must presume that the legislature used such a broad formulation

25

purposely. To conclude otherwise would be to judicially truncate the ordinary meaning of the words "relates to."

*Texas Dept. of Public Safety. v. Abbott*, 310 S.W.3d 670, 675 (Tex.App.-Austin 2010, no pet.) *Cf Buck v. Blum*, 130 S.W.3d 285, 291 (Tex. App. – Houston [14th Dist.] 2004, no pet.) (claim that institute failed to follow procedures that would reduce the potential for assault by doctor performing examination was a claim "relating to medical care.")[7] Indeed, §74.001 of the Civil Practice and Remedies Code, which governs health care liability claims and is directly referenced in §26.01(b)(8) of the statute of frauds, recognizes that something as tangential as "administrative services" may be "directly related to health care." *See* TEX. CIV. P. & REM. CODE § 74.001(a)(13) (defining "health care liability claim" to include claims based on "administrative services directly related to health care"). *See also Four Seasons Nursing Center v. Weber Medical Systems, LLC*, 04-74614 (E. D. Mich. September 28, 2005) (alleged oral agreement between Nursing Center and medical system provider to supply and install hemodialysis unit was barred by the statute of frauds because it was an agreement "relating to medical care.")

---

[7] *See also Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*, 183 S.W.3d 891, 897-98 (Tex. App.—Austin 2006, no pet.) (the term "relates to" in the arbitration context has been interpreted to mean anything "having a significant relationship to the contract regardless of the label attached to the dispute" or that "touch" matters covered by the contract); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84, 112 S.Ct. 2031 (1992) (in the context of statutory preemption, "The ordinary meaning of [relating to] is a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' …-- and the words thus express a broad preemptive purpose.… We have said, for example, that the 'breadth of [that provision's] preemptive reach is apparent from [its] language,'…; that it has a 'broad scope,' … and an 'expansive sweep,'…; and that it is 'broadly worded,' …'deliberately expansive,'… and 'conspicuous for its breadth,'") (citations omitted).

26

In sum, the alleged agreement "relates to" medical care as a matter of law.

### (ii)  Amerigroup has no "history" or case law supporting its argument.

Amerigroup claims that "Town Park's interpretation of §26.01(b)(8) contradicts the statute's history," but Amerigroup cites neither statutory "history" nor any case law contradicting Town Park's position. *See* Appellant's Br. 32-33. Instead, it cites three cases holding that claims based on an oral warranty of cure would be barred by § 26.01(b)(8) and argues that, because it has found no case law on point, the statute must be limited "to situations where a doctor or healthcare provider makes a representation of specific results." *Id.* None of the cases cited by Amerigroup suggest any such limitation; nor is its argument consistent with the statutory language, which is not limited to "warranties of cure." *See* § 26.01(b)(8).

Amerigroup's argument that "it is unlikely the Texas Legislature intended that <u>all</u> contracts relating to medical care … had to be in writing," simply ignores the language of the statute.  There is no qualifier limiting the application of the statute to only *some* contracts relating to medical care, other than the requirement that the contract be made by "a physician *or* health care provider."  The legislature's omission of other limiting terms is presumed to have been done purposefully. *See Tenaska Frontier Partners, Ltd. v. Sullivan*, 273 S.W.3d 734, 738 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (cited by Amerigroup) ("we must presume that every word excluded from a statute (such as 'some' qualifying

27

'postage prepaid') was excluded for a purpose."). *Accord TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen.") "A court may not judicially amend a statute by adding words that are not contained in the language of the statute. Instead, it must apply the statute as written." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015).

### (iii) Town Park's argument does not lead to "absurd results."

Contrary to Amerigroup's "absurd results" argument, it is not "Town Park's view" that "every payor must have a written agreement with any provider." Appellants' Br. 35. Nor does Town Park's position "oblitierat[e] a fundamental difference in the health care industry between in-network and out-of-network providers." *Id.* On the contrary, Amerigroup's argument that it had an agreement for Town Park to accept a pre-agreed rate for all 41899 procedures destroys this "fundamental difference" and contradicts its unequivocal admission that Town Park was out-of-network.

The very essence of being "in-network" is the existence of an agreement to accept a pre-agreed rate for particular procedures. Amerigroup's argument that there was an enforceable oral blanket agreement to accept a pre-agreed rate for all 41899 procedures is equivalent to alleging a verbal agreement making Town Park

28

"in-network" for those procedures. Thus, Amerigroup tries to make Town Park "in-network" while at the same time admitting that Town Park was in fact "out-of-network."

Nothing about Town Park's position requires other payors to "overhaul their business approach." *See id.* Nor could they do so. As recognized by Amerigroup, most cases involve group health plans, such as those provided by Blue Cross Blue Shield. In those situations, payment obligations are governed by the terms of the plan and are enforceable under ERISA by the "participant or beneficiary." *See* 29 U.S.C. § 1132(a)(1)(B). Out-of-network providers set their own rates at which they bill their patients. The amount the insurer pays is determined *by the terms of the insurance agreement (which typically constitutes an ERISA plan) between the insurer and the patient* because there is no separate agreement between the insurer and the provider.[8]

Nothing requires any "overhaul." The insurers simply pay in accord with the terms of their plan. If the insurer fails to pay, the provider may collect from the patient and the patient may recover from the insurer. The out-of-network provider has no standing to recover directly from the insurer absent an assignment from the

---

[8] It makes no difference whether the provider bills the patient and the patient seeks reimbursement from their insurer or the provider, with the patient's agreement, bills the insurer directly as a courtesy to the patient. In either case the insurer is paying an amount it owes under its policy to cover a portion of the patient's debt to the provider. The payment to an out-of-network provider is not being made pursuant to any contract with the provider.

2155944.4/SPH/27768/0101/103015

patient because there is no contract between the provider and the insurer. *See, e.g., Hermann Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286 (5th Cir. 1988).

Amerigroup's statement that a payor makes payment to an out-of-network provider "at its own peril since no enforceable contract exists" makes no sense because the payor makes payment for known medical procedures at a rate governed by its own plan with its insured.[9] If the insurer overpays, it has no *contractual* right to recover from the provider because it has no contract with the provider. Depending on the facts of the case, the insurer may or may not have an *equitable* right to recover an overpayment. For example, in *Lincoln Nat. Life Ins. v. Brown Schools*, this Court affirmed summary judgment denying an insurer restitution for mistaken overpayments to a hospital. This Court pointed out that the insurer "knew its own policy payment provisions" and that the provider "has no responsibility to determine if an insurance carrier is properly tending to its business." *Lincoln Nat. Life Ins. v. Brown Schools*, 757 S.W.2d 411, 414 (Tex. Civ. App.—Houston [14th Dist.] 1988, no writ).

Amerigroup's assertion that if an insurer paid nothing to an out-of-network provider such as Town Park, the provider "would have no recourse" is equally nonsensical. Appellant's Br. 36. The provider's normal recourse is to collect from the patient who owes the debt for services rendered in the first place. If the

---

[9] Amerigroup's argument also implies that all providers must have a contract with the payor, which would do away with the entire out-of-network category of providers who, by definition, have no such contract.

30

procedure should have been covered, a suit may be filed under ERISA *by or on behalf of the patient* to recover benefits due under the terms of the plan. *See* 29 U.S.C. § 1132(a)(1)(B). Absent an enforceable agency or assignment agreement, however, an out-of-network provider has no standing to assert a direct claim against the patient's insurer because, again, there is no contract between the provider and the insurer. *See, e.g.*, *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348 (5th Cir. 2002).

While ERISA is not applicable here because Amerigroup is managing payments for members of Texas Medicaid, the principles outlined above are the same. Amerigroup's agreement is with the patient. Amerigroup itself determined the amount to pay Town Park and it typically paid thousands less than Town Park's invoiced amount. Those payments were made pursuant to Amerigroup's agreement with its members and not pursuant to any contract with Town Park. It therefore has no contractual basis for recouping those payments from Town Park years after the fact. *Brown Schools*, 757 S.W.2d at 415.

### (iv) Amerigroup's "performance" is inconsistent with the alleged oral agreement.

Amerigroup argues that the alleged oral agreement falls outside the statute of frauds "because Amerigroup (over)performed." Appellant's Br. 36. An oral agreement may be enforceable despite the statute of frauds if the contract has been performed, but only to the extent of that performance. *See Stovall & Assocs. v.*

31

*Hibbs Fin. Ctr., Ltd.*, 490 S.W.3d 790, 799 (Tex. App.—Dallas 2013, no pet.). To enforce an agreement on that basis, the actions asserted to constitute performance must be "unequivocally referable" to the alleged oral agreement and corroborate the existence of that agreement; the actions "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced." *Id.* (*citing Exxon Corp. v. Breezevale, Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied).

Amerigroup's performance is not "unequivocally referable" to the agreement it alleges. Amerigroup's "performance" flatly contradicts any alleged agreement to accept Medicaid rates because Amerigroup consistently paid higher rates. Indeed, Amerigroup's own reference to "(over)performance" demonstrates that the alleged performance differs from the terms of the alleged agreement and, therefore, is not unequivocally referable to it.[10]

In addition, Amerigroup's performance with respect to *individual patients* is not unequivocally referable to any sort of agreement to accept Medicaid rates *on a blanket basis for all patients* going forward. Thus, Amerigroup cannot use performance to escape the statute of frauds.

---

[10] If anything, Amerigroup's performance is referable to its insuring agreement with its own members.

32

### (v) Town Park's invoices do not satisfy the statute of frauds.

Town Park's invoices do not satisfy the statute of frauds for an obvious reason: They do not evidence an agreement to accept Medicaid rates. Thus they do not constitute "a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the [alleged] agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." *Cohen v. McCutchin*, 565 S.W.2d at 232.

*Cox Engineering, Inc. v. Funston Mach. and Supply Co.*, 749 S.W.2d 508 (Tex. App.—Fort Worth, 1988, no writ), cited by Amerigroup, is not to the contrary. First, *Cox* involved the "merchant's exception" to the statute of frauds contained in article 2 of the UCC, which provides that a written confirmation of an oral agreement may be sufficient unless a written notice of objection to its contents is given within ten days. TEX. BUS. & COM. CODE ANN. §2.201. That exception has no application to §26.001 of the Business & Commerce Code, which applies here. Second that exception applies to "written confirmations" of an oral contract. Town Park's invoices in no way confirm the oral contract alleged by Amerigroup. All of the invoices are for substantially more than Medicaid rates and therefore directly contradict the alleged agreement.

33

### (vi) Amerigroup's "voidable, not void" argument is frivolous.

Amerigroup's argument that, under the statute of frauds, the agreement it alleges would be voidable, not void, and is therefore enforceable unless and until Town Park "rejects" or "repudiates" the alleged contract and returns the consideration received is incomprehensible and frivolous. *See* Appellant's Br. 38. Amerigroup cites absolutely no case law standing for the proposition that a party must "repudiate" an agreement that it contends does not exist before the statute of frauds may be applied as a defense.[11] Indeed, Amerigroup's argument is circular because it presumes the existence of the alleged agreement such that it could be "repudiated" or "rescinded."

There was no agreement like the one alleged by Amerigroup and, if there were, such an oral agreement would be unenforceable under the statute of frauds. The payments made by Amerigroup were not made pursuant to any contract with Town Park; Town Park was admittedly out-of-network. The payments were made pursuant to Amerigroup's contractual obligations to its own insureds to pay their medical expenses. Town Park is not required to "repudiate" a non-existent agreement to have the statute of frauds bar the alleged verbal agreement.

---

[11] In *Eland Energy, Inc. v. Rowan Oil & Gas, Inc.*, 914 S.W.2d 179, 186 (Tex. App.—San Antonio 1995, writ denied), cited by Amerigroup, there was a written agreement but one party alleged that the description of land in the agreement was too vague to be enforced. The court found the land was adequately described. *York Group, Inc. v. Horizon Casket Group, Inc.*, 2007 U.S. Dist. LEXIS 49778 (S.D. Tex. July 10, 2007), cited by Amerigroup for its "repudiation" argument, does not involve the statute of frauds at all.

34

**4.** **The agreement alleged by Amerigroup involves an alleged promise by one to answer for the debt of another and is therefore barred by the statute of frauds.**

The statute of frauds also applies to a "promise by one person to answer for the debt … of another person." Such an agreement must be in writing and signed by the party to be charged to be enforceable. *See* TEX. BUS. & COM. CODE § 26.01(a)(1), (b)(2); *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641-42 (Tex. 2013); *Dynegy, Inc. v. Yates*, 345 S.W.3d 516, 523-24 (Tex. App.—San Antonio 2011, pet. granted), *rev'd on other grounds*, 422 S.W.3d 638 (Tex. 2013) (*citing Banfield v. Davidson*, 201 S.W. 442, 443 (Tex. Civ. App.—Galveston 1918, no writ) and *Evans v. Shaw*, 268 S.W. 1037, 1037-39 (Tex. Civ. App.—Waco 1925, no writ).

In *Dynegy*, Yates, an attorney, alleged the existence of a verbal agreement under which Dynegy agreed to pay the legal expenses for one of Dynegy's former officers who was represented by Yates. *Dynegy*, 422 S.W.3d at 642. The Supreme Court found the agreement subject to the statute of frauds and unenforceable as a matter of law. *Id*. at 643. Similarly here, Amerigroup's breach of contract claim falls within § 26.01(b)(2) of the statute of frauds because it seeks to enforce an alleged agreement between Amerigroup and Town Park under which Amerigroup would pay the medical expenses incurred by Town Park's patients (like the agreement between Dynegy and Yates to pay the legal expenses of Yates' client), at a certain specified rate in the Medicaid fee schedule. Thus, Amerigroup's breach of contract claim is barred by the statute of frauds under § 26.01(b)(2).

35

**(a)    Amerigroup was answering for the debt of another.**

Amerigroup's argument that the amounts it paid were not "the debt of another person" is circular.  Indeed, it affirmatively demonstrates that the original debt belongs to the patient because the patient is relieved of responsibility for that debt only when the services are actually covered.  *See* Appellant's Br. at 26 (Arguing that under the Texas Administrative Code, patients "are not responsible for paying for *covered* services.")[12]  If Amerigroup claimed the patient was not covered and did not pay, the patient would undeniably remain responsible for paying because it is the patient's debt in the first instance.  Thus the amount owed for health care services rendered to Town Park's patients is, at its core, the patient's debt.

This is not significantly different than private insurance.  An in-network provider has an agreement with the insurer under which the provider agrees to accept a pre-defined amount for particular procedures.  When the procedure is covered, the insurer should pay and the patient will be relieved of the debt.  Similarly, when a provider is out-of-network, it cannot recover from the patient amounts covered and paid by the insurer because the provider is not entitled to be paid twice.  This in no way suggests that the debt does not belong to the patient in

---

[12] The Texas Administrative Code does not apply to Amerigroup's claims.  Indeed, Amerigroup has no standing to assert violations.  *See* Texas Admin. Code § 371.1653(5) and (6) (permitting administrative actions or sanctions).  Further, Chapter 353 of the TAC cited by Amerigroup addresses obligations of managed care organizations (Amerigroup), not providers (Town Park).

36

the first place because, whether Medicaid or private insurance is involved, the patient must pay if the insurer does not.[13]

The "Patient Authorization & Responsibility Form," which is used for Medicaid and non-Medicaid patients alike, recognizes this fact. It contains an acknowledgement that the debt for services rendered belongs to the patients and that they will be responsible for payment if the insurer does not provide coverage: "I agree that I am financially responsible to pay for any charges not covered by my insurance company and/or co-insurance, deductible, co-pay amounts that are outstanding." Supp. CR 261. This recognizes that the original debt belongs to the patient such that if Medicaid or a private insurer does not pay, the patient remains responsible.

In sum, much like the agreement alleged in *Yates*, the verbal agreement alleged by Amerigroup is one which purportedly establishes a direct obligation to Town Park to pay the patients' debts for services rendered by Town Park. Accordingly, the alleged agreement is barred by the statute of frauds.

### (b) The "leading object" doctrine does not apply.

Amerigroup's argument that it can avoid the §26.001(b)(2) under the "leading object" doctrine is nothing more than an assertion that because Amerigroup is in business to make a profit, the statute of frauds does not apply to

---

[13] The one difference between patients covered by Medicaid and patients covered by ordinary private insurance is that, under Medicaid, out-of-network providers are prohibited from "balance billing" the patient for the portion of the full charge Medicaid does not pay. That, however, does not change the fact that the original debt is the patient's debt.

37

it. If that were the case, no commercial surety agreement would be within the statute of frauds because all commercial sureties are in business to make a profit.

As Amerigroup's own authority points out, "The theory of the main purpose rule is that where the promise is made for the promisor's own benefit *and not at all for the benefit of the third person*, the reason for the statutory provision fails and the promise should be enforced." *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.*, 436 S.W.2d 889, 895 (Tex. 1969). It is a narrow exception that applies only when the **main object** of the arrangement subserves the promisor's **main purpose**.

For example, in *Haas Drilling Co. v. First Nat'l Bank*, the court held that where a bank foreclosed on a debtor's oil lease, the bank's oral promise to pay the drilling company the amount the debtor owed for gas produced, so the company would continue producing gas, was enforceable because the main purpose of doing so was "to protect the value of the property which it had bought in at the foreclosure sale." *Haas Drilling Co. v. First Nat'l Bank*, 456 S.W.2d 886, 891 (Tex. 1970). There is nothing like that here. Instead, the "main purpose" of the alleged oral agreement was simply to obtain authorization for dentists to perform the 41899 procedures at Town Park's facility; a benefit to Amerigroup's insureds, not to Amerigroup. Indeed, by the testimony of Amerigroup's own witness, the telephone conversation in which the agreement was allegedly made was initiated to obtain authorization for Dr. Ralph to perform a procedure at Town Park, not to obtain any direct benefit for Amerigroup. Supp. CR. 231 (Ex. E at p. 38 ll. 3-23).

38

**C. Amerigroup Cannot Recover Because the Alleged Agreement Was Not Entered Into by Someone With Actual or Apparent Authority to Make a Blanket Fee Agreement On Behalf of Town Park.**

Town Park's Second Motion for Summary Judgment proved that the only person with authority to make a blanket fee agreement on behalf of Town Park at the relevant time was Kraig Killough, and he never made an agreement with Amerigroup like the one alleged. Mr. Killough testified as follows:

Q. And because they're out of network, there's no agreement in place; but that out-of-network provider -- that insurance company -- says up front, "Hey, before we authorize this, we need to reach an agreement on a rate."

A. Uh-huh.

Q. You with me?

A. Yes.

Q. And they'll ask, "Hey, Town Park, what's your fully billed charge for this service?" And you say, "$10,000."

A. Okay.

Q. The out-of-network insurance company says, "I want to negotiate something south of $10,000 in order to get my business." Who had authority in 2009, 2010 to have that conversation?

A. Myself.

Q. And that's it?

A. That's it.

Q. No one else in 2009, 2010 had that authority, from Town Park's perspective?

A. Correct.

39

Q. And I believe you testified earlier that nobody -- no out-of-network insurance company actually had that conversation with you?

A. Correct.

Supp. CR 254-55 (Ex. G at p. 211, ll. 15, p. 212, ll. 15).  Similarly, the affidavit of Sourabh Sanduja, who is the Senior Vice President of Altus Healthcare Management, L.P.,[14] and Administrative Director of Town Park, states:

> Town Park has never entered into written or verbal agreements with Plaintiff Amerigroup Texas, Inc. ("Amerigroup") to accept reimbursements based on the Medicaid fee schedule or any other schedule. There has never been any male employee at Town Park who entered into such an agreement.

CR 538 (Ex. B).

This evidence is sufficient to grant summary judgment in favor of Town Park.  Amerigroup presented no controverting evidence to raise a genuine issue of material fact.

### 1. The burden of proof was on Amerigroup to prove actual or apparent authority.

In attempting to overcome summary judgment based on lack of authority, Amerigroup first contends that lack of authority is an affirmative defense and therefore may not be the subject of a no-evidence summary judgment. Amerigroup's argument is moot because, as shown above, Town Park did not rely simply on a lack of evidence supporting Amerigroup's position; it affirmatively proved the lack of authority through the testimony of Mr. Killough and Mr.

---

[14] Altus Healthcare Management provides billing and management services to Town Park.  Supp. CR 259 (Killough Aff't).

Sanduja. Amerigroup presented no evidence to overcome that testimony and raise a genuine issue of material fact.

Amerigroup is wrong in any event. The case law is clear that lack of actual or apparent authority is not an affirmative defense. As Town Park pointed out in its Second Motion for Summary Judgment, Amerigroup had the burden of proving authority; there is no presumption of an agency relationship. *See* Supp. CR 180; *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). *See also American Bank & Trust Co v. Freeman*, 560 S.W.2d 444 (Tex. Civ. App.—Beaumont 1977, writ ref'd n.r.e.) ("While this authority may be express or apparent, the burden of proof is upon him who alleges authority; in the absence of proof no presumption of authority will be indulged."); *First Nat. Bank v. Slaton Independent School Dist.*, 58 S.W.2d 870, 875 (Tex.Civ.App. –Amarillo 1933, writ dism'd) ("The burden of proof is upon him who alleges authority; in the absence of proof no presumption of authority will be indulged."); *Mission Linen Supply, Inc. v. Sandy's Signals, Inc.*, 2-07-014-CV, 2007 Tex. App. LEXIS 5968 *10; 2007 WL 2152070 (Tex. App.--Fort Worth, July 26, 2007) ("the burden of proof is on the party relying on the doctrine of apparent authority to bind a principal to prove facts that will establish apparent authority").[15]

---

[15] Amerigroup cites no authority holding that lack of actual or apparent authority is an affirmative defense and instead relies solely on the fact that, out of an abundance of caution, Town Park pleaded lack of actual or apparent authority as a defense. *See* Appellant's Br. at 40.

2155944.4/SPH/27768/0101/103015

Because the burden to prove actual or apparent authority was on Amerigroup, the lack of actual or apparent authority could properly have been the subject of a no evidence motion for summary judgment.

> **2. Amerigroup presented no evidence that the unidentified person who supposedly entered into the alleged blanket fee agreement had actual or apparent authority to do so on behalf of Town Park.**

> **(a) No evidence of actual authority.**

Actual authority includes both express and implied authority and generally represents the authority a principal intentionally confers upon an agent, intentionally allows the agent to believe he possesses, or by want of due care allows the agent to believe he possesses. *2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Actual authority is based on the principal's written or spoken words or conduct communicated to the purported agent. *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Amerigroup presented no evidence that the unidentified "other person" with whom Nancy Jones supposedly spoke had actual authority to bind Town Park to an agreement to accept reimbursement for its billed charges at Medicaid rates for any patient, much less for all future patients.

Nancy Jones admitted this supposed "agreement" is based only on "*one conversation*" with an unidentified male.

42

Q. Okay. And so it's your testimony that on one occasion you had a conversation with somebody at Town Park Surgery Center and that person accepted the Texas Medicaid fee schedule and you documented that?

A. Yes.

Q. Do you know the person's name?

A. I don't remember.

Supp. CR 228 (Ex. E at p. 34, ll. 9-15).

Ms. Jones allegedly spoke with this unidentified man after dialing a phone number and extension given to her by JoAnn, another Town Park employee, but she does not know this man's title, role, or even in which department he worked. [16] Nor could she state an approximate time, week, month, or even year during which this conversation may have taken place.

Q. Okay. And you said "I would have talked – I would have called her. I want to know what your actual recollection is, not what your practice is. Those are two different things, both of which are fine. But let me talk about your actual recollection of the call that you had with JoAnn Deases that resulted in what you say to be acceptance of the Texas Medicaid fee schedule. And let's -- let me just clarify.

A. Okay.

Q. You don't know what year it was; is that correct?

A. (Shakes head.)

Q. You don't know what month it was?

---

[16] There is no dispute that JoAnn did not have authority to make such an agreement. *See* CR 264. Ms. Jones and Mr. Chidester both acknowledge that fact. Supp. CR 237 (Ex. E at p. 45 ll. 5-11); Supp. CR 242 (Ex. E at p. 85 ll. 4-18). *See also* Supp. CR 201-03 (Ex. B at p. 27, ll. 13 – 25, p. 28, ll. 1- 25, p. 29, ll. 1- 3).

43

A. No.

Q. You don't know what day of the week it was?

A. No.

Q. You don't know what time of the day it was?

A. No.

Q. You don't know who you ultimately spoke with --

A. No.

Q. -- by name --

A. No.

Q. -- or title?

A. No.

Q. Is that correct?

A. Yes.

Q. Or department?

A. Right.

Supp. CR 230-31 (Ex. E at p. 37 ll. 1 - 25, p. 38 ll. 1 - 3). *See also* Supp. CR 229,

238-39 (Ex. E at p. 36, ll. 8-18, p. 67, ll. 8-25, p. 68, ll. 1-18).

Ms. Jones did not even ask what the unnamed man's role at Town Park was

-- although she acknowledges this information would be pertinent -- much less

whether he had authority to enter into reimbursement contracts on behalf of Town

Park.

Q. His role or title would be important, wouldn't it, so that you would
know that this person actually had authority to bind Town Park
Surgery Center to this fee schedule?

44

A. Yes, it probably was pertinent. I can't say that I was thinking that when I was documenting it.

Supp. CR 236-37 (Ex. E at p. 44 ll. 1- 22, p. 45 ll. 1- 4).  *See also* Supp. CR 243 (Ex. E at p. 100, ll. 4 -16).

In any event, there is no male at Town Park who would have accepted Amerigroup's lowball reimbursement; not on a one-time basis, and certainly not for the indefinite future.  CR 537-38 (Ex. B).  There was only one person with such authority at Town Park during the time period Amerigroup alleges this verbal agreement came into existence—Kraig Killough.  Mr. Killough did not have any conversations with anyone from Amerigroup regarding Amerigroup's reimbursement rate.  Supp. CR 253-55 (Ex. G at p. 210, ll. 24-25, p. 211, ll. 1-25, p. 212, ll. 1-15).

There is thus no evidence the unnamed male who Ms. Jones alleges answered the phone at Town Park and accepted reimbursement at the Medicaid fee schedule had actual authority to enter into such an agreement on behalf of Town Park.  The only evidence is that he did not.

### (b)  No evidence of apparent authority.

There also is no evidence that the unnamed male had apparent authority to bind Town Park to an agreement relating to reimbursements. Apparent authority arises when a principal intentionally or negligently induces a party to believe that a person is the principal's agent though the principal has not conferred authority on that person. *Thomas Reg'l Directory Co., v. Dragon Prods., Ltd.*, 196 S.W.3d 424,

45

427 (Tex. App.—Beaumont 2006, pet. denied). "Because apparent authority is based on estoppel, the principal's conduct must be that which would lead a reasonably prudent person to believe that authority exists." *Id*. at 428. In making the determination of whether apparent authority exists, only the conduct of the principal is relevant. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). The purported agent cannot confer apparent authority on himself. "[T]he standard is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority. Thus, to determine an agent's apparent authority we examine the conduct of the principal and the reasonableness of the third party's assumptions about authority." *Id.* at 182-83.

Moreover, because the doctrine of apparent authority is based on estoppel, it is essential "that the person claimed to be estopped have had knowledge of all material facts at the time of the conduct alleged to constitute the basis of the estoppel." *Rourke v. Garza*, 530 S.W.2d 794, 803 (Tex. 1975). For example, in *Rourke*, the principal's superintendent did not have apparent authority to enter into an indemnity agreement where the principal did not have knowledge that the delivery ticket the superintendent signed contained an indemnity. Similarly, here, there is no evidence that any principal of Town Park was made aware that Jones was seeking a blanket fee agreement from the unidentified "other person." On the contrary, Jones testified she called asking about a single case rate agreement for a single procedure by Dr. Ralph. Nor is there any evidence that Town Park was

46

aware of the unidentified person purporting to enter into a blanket fee agreement for all 41899 procedures.

Amerigroup argues that apparent authority may be created "when an employer places an employee 'in a position in an industry or setting in which holders of the position customarily have authority of a specific scope,' a third party can rely on this authority absent notice to the contrary." Appellant's Br. 41. However, there is no evidence that Town Park placed the unidentified person in such a position; there is no evidence of what position, *if any*, the unidentified person held, much less that it was a position in which the individual would customarily have authority to enter into blanket heavily discounted fee agreements.

Town Park, the principal, did not intentionally or negligently lead Ms. Jones to believe the unnamed male had authority to bind it to a blanket agreement to accept reimbursement at the Medicaid fee schedule. Jones testified only that when she called JoAnn about a "single case rate agreement" for Dr. Ralph, JoAnn referred her to the unnamed male. But that will not suffice to create apparent authority to enter into a blanket fee agreement. JoAnn is not Town Park, Jones knew JoAnn merely worked in the scheduling department and did not have authority over such agreements, and Jones never informed JoAnn that she was seeking a blanket fee agreement. Supp. CR 237, 242 (Ex. E at p. 45, ll. 5 -11; p. 85, ll. 4 -18). JoAnn, who had no authority herself, cannot have created apparent authority for the unnamed male to bind Town Park to a blanket fee agreement.

47

Amerigroup cites three documents, which it contends are evidence that Sourabh Sanduja was the person who supposedly entered into the alleged agreement. The first is an internal Amerigroup e-mail string dated in January 2011, which does not even mention Mr. Sanduja. Supp. CR 900-01. It adds nothing to Nancy Jones' testimony that she supposedly talked to some unidentified person who supposedly agreed to accept Medicaid rates.[17]

The second is simply an organizational chart showing Mr. Sanduja below Kraig Killough. Supp. CR 1019. As noted, Mr. Killough was the only person authorized to enter into blanket fee agreements. Mr. Sanduja did not have such authority.

The third is a screen shot for a particular individual patient dated in April 2010. The entry dated April 8, 2010 states, "It is unknown whether or not this provider [Town Park] accepts 100% Medicare rates. It is unknown whether or not this provider accepts 100% Medicaid rates." Supp. CR. 1017. Thus, Amerigroup's own internal documents show there was no blanket agreement to accept Medicaid rates. In fact, if there were such a blanket agreement there would have been no need for Amerigroup to seek authorization to pay Medicaid rates for this particular individual.

---

[17] Notably it states that Jones talked to "an administrator there at Town Park when we started the 95% OON rates and Town Park accepted." Thus it differs materially from her testimony that she talked with someone who agreed to accept 100% of Medicaid rates. There is no evidence that this note made in 2011 even refers to the same alleged conversation on which Amerigroup bases its claim for reimbursement going back to 2008.

48

Beyond all this, Amerigroup did nothing as a reasonably prudent person to exercise diligence and discretion to ascertain the supposed agent's authority. Amerigroup does not know the anonymous male's name, title, role, or any other identifiable information indicating he would have authority to bind Town Park to a verbal agreement over the phone regarding heavily discounted reimbursement rates indefinitely in the future. Not only did Ms. Jones fail to confer with anyone who qualified at Town Park, she admits that she did not even bother to ask the unidentified person this information.

> Q. And you said you talked to an administrator there but just to confirm, your testimony is that you actually don't know what that person's role was; is that correct?
>
> A. That's correct.
>
> Q. You were assuming it was an administrator?
>
> A. Yes.
>
> Q. You didn't ask him if he was?
>
> A. No.
>
> Q. And he didn't tell you that he was?
>
> A. No.
>
> Q. Is that correct?
>
> A. Correct.

Supp. CR 243 (Ex. E at p. 100 ll. 4 -16).

The trial court properly granted summary judgment on Amerigroup's breach of contract claim because there is no evidence that the "other person" to whom Ms.

Jones allegedly spoke had authority to bind Town Park to a blanket agreement to accept reimbursement at the Medicaid fee schedule and no principal of Town Park did anything to confer apparent authority on that unidentified "other person."

**D.  Amerigroup Cannot Recover For Breach Of Contract Because Town Park Did Not Fail To Comply With Any Alleged Contract Term.**

**1.  The alleged agreement does not address reimbursement of overpayments.**

To prove an action for breach of contract, the plaintiff must establish: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained as a result of the breach. *See Williams v. Unifund CCR Partners*, 264 S.W.3d 231, 235-36 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Thus, the party must identify the term of the contract that was breached.

Because Amerigroup's claim is that Town Park breached the alleged agreement by failing to reimburse it for overpayments, it must establish the existence of a contract term obligating Town Park to make such reimbursements.

In-network arrangements between providers and insurers sometimes include provisions whereby insurers have the right to audit providers' billing, and providers are required to reimburse insurers where such audits evidence overpayment. Town Park, however, was an out-of-network provider and, when Ms. Jones was asked to recount her conversation with the "other person" who supposedly made the agreement, she said nothing about any term addressing

50

reimbursement of overpayments. *See* Supp. CR 231, 234-35 (Ex. E at p. 38, ll. 4-23; p. 41, l. 19 – 42, l. 6) (quoted above). Thus, in contrast to the type of in-network arrangement described above, there is no allegation or evidence that the alleged agreement contained any provision under which Town Park agreed to reimburse Amerigroup for overpayments made by mistake. Amerigroup admits that fact when it argues "the trial court should have inferred [such a] term." Appellant's Br. 47.

In the absence of any contractual term requiring reimbursement of claimed "overpayments" it cannot be *a breach of contract* to refuse to return alleged overpayments. That is not to say there is never a remedy for a mistaken overpayment but, in the absence of a controlling contract term, any such remedy is governed by rules of equity. *See Lincoln Nat. Life Ins. Co. v. Brown Schools, Inc.*, 757 S.W.2d 411 (Tex.App. —Houston [14th Dist.] 1988, no writ).

## 2. The alleged agreement does not address billing methodology.

In its brief, Amerigroup also suggests that Town Park is somehow responsible for Amerigroup's claimed mistake because Town Park used an SG "modifier" rather than an EP "modifier" with the 41899 procedure code in its invoices. This argument is a red herring for a number of reasons.

Just as there is no evidence of a reimbursement term in the alleged contract, there also is no evidence of a term addressing the format of Town Park's invoices.

51

If there was, Amerigroup could simply have rejected the invoices until they were submitted as Amerigroup required.

Amerigroup is not alleging that any of Town Park's invoices were fraudulent or misleading. Amerigroup's corporate representative Edmund Chidester testified:

Q. And you're not alleging fraud in this case?

A. No.

Q. And you don't believe there is any fraud?

A. No.

Q. Is that correct?

A. Correct.

Supp. CR 419 (Chidester Dep. p 63, l. 22 – 63, l. 2). He further admitted Amerigroup's case is solely dependent on the alleged oral agreement, which, as noted, never mentioned billing format. Supp. CR 205 (Ex. B at p. 32, ll. 5-10).

Moreover, use of the SG modifier was entirely appropriate. The SG modifier simply indicates that Town Park is a surgery center which, of course, Town Park is. CR 315 (Chidester Dep. p 61, ll. 18 - 22). Contrary to Amerigroup's assertion, the Medicare Claims Processing Manual does not preclude the use of the SG modifier after January 1, 2008. It states only that ambulatory surgical centers are *not required* to use the modifier after January 1 2008. CR 631 ("Beginning January 1, 2008, ASCs no longer are required to

include the SG modifier on facility claims in Medicare.")[18] The EP modifier merely indicates that the service is associated with "THSteps," or Texas Health Steps which is a children's program under Texas Medicaid that provides medical and dental preventive care and treatment. Supp. CR 1031. Neither modifier determines the amount of reimbursement.

Finally, use of the SG modifier did not cause Amerigroup to overpay. Before January 1, 2008, when even Amerigroup admits use of the SG modifier was appropriate, Amerigroup did not pay the Medicaid rate; it routinely paid from $3412 to $5460 per procedure. *See* Supp. CR 1059. Conversely, Amerigroup did not pay the Medicare rate when the EP modifier was used.[19] This is true both before and after January 1, 2008. Thus, Amerigroup cannot tie any claimed coding issue to the alleged overpayments.

The most Chidester could say was that because of the use of the SG modifier, Amerigroup processed Town Park's invoices manually. Thus, an individual at Amerigroup reviewed the invoices for the particular procedures and

---

[18] Amerigroup does not cite to the actual Medicare Claims Processing Manual when it claims that use of the SG modifier is inappropriate after January 1, 2008. It cites to WPS Medicare, which is Wisconsin Physicians Service Insurance Corporation. *See* Supp. CR 1034. In light of the Medicare Claims Processing Manual, the statement relied on by Amerigroup reflects only that the use of the SG modifier is unnecessary, not that it is improper.

[19] When Town Park used the EP modifier, Amerigroup typically paid nothing (which even Amerigroup does not claim was proper). *See* Supp. CR 1059. On at least two occasions, however, Amerigroup paid $1500 and $4200 when an EP modifier was used. *See* Supp. CR. 1059, 1070. Amerigroup did not pay the Medicaid rate until sometime in 2011 *after* it began making reimbursement demands, and then it did so even when no modifier was used.

53

made a conscious decision as to the appropriate payment amount in each case.  CR 315-16 (Chidester Dep. p 61, l. 23 – 62, l. 17).

The use of the SG modifier was not a breach of the alleged oral agreement, was not improper under any applicable regulation, did not determine the appropriate amount of payment, and did not cause any overpayment.

**E.    The Trial Court Did Not Err in Granting Summary Judgment Based on the Statute of Limitations as to the Additional 109 Claims on Which Amerigroup First Sought Recovery in 2014.**

Amerigroup filed its Fourth Amended Petition on November 14, 2014 adding 109 more claims dating from December 21, 2008 through September 11, 2010, and alleging that Town Park committed a breach of contract by failing to reimburse Amerigroup for overpayments when they occurred.  CR 495.  Each of these claims accrued more than 4 years before being made a part of this suit.  Accordingly they are barred by the 4 year statute of limitations. TEX. CIV. PRAC. & REM. CODE § 16.004.

Section 16.068 of the Civil Practice and Remedies Code does not cause these claims to "relate back."  That section states:

> If a filed pleading relates to a cause of action, cross-action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

54

TEX. CIV. PRAC. & REM. CODE § 16.068. Amerigroup did not merely "change the facts or grounds of liability." Each of the 109 new claims is "wholly based on a new, distinct, or different transaction or occurrence."

The payment for each patient constitutes a separate and distinct transaction. Put simply, the billing and payment for services rendered to patient Jane Doe is a completely distinct and different transaction or occurrence than the billing and payment for services rendered to patient Ron Roe. The two have nothing to do with each other. By adding 109 separate and distinct claims relating to different patients, Amerigroup brought wholly new, distinct and different transactions into the suit. These claims do not relate back to the filing of the original petition.

It does not matter that Amerigroup alleges an overarching continuing contract to accept Medicaid rates: "if the terms of a continuing contract call for fixed, periodic performance during the course of the agreement, a cause of action for the breach of the agreement may arise at the end of each period, before the contract is completed. … The injured party has four years from each breach to bring suit." *Capstone Healthcare Equipment Services, Inc. v. Quality Home Health Care, Inc.*, 295 S.W.3d 696, 701 (Tex.App.-Dallas 2009, pet. denied) (citations omitted). Thus, a party may not allow repeated breaches to continue accruing indefinitely, file suit 3 years 364 days after the last breach, and then add all prior breaches claiming that they relate back indefinitely.

55

**F.    Amerigroup Has Abandoned Its Equitable Causes of Action and Waived Any Claimed Error in Granting Summary Judgment on Those Causes of Action.**

When Amerigroup filed its Fourth Amended Petition after the trial court granted summary judgment on Amerigroup's equitable claims (*see* CR 327), the only cause of action it alleged was breach of contract. CR 495. It dropped all of the previously alleged equitable claims such as money had and received. Amerigroup has therefore abandoned all of those equitable claims, and waived any error associated with the court's grant of summary judgment on those claims, as its live pleading does not allege those causes of action. TEX. R. CIV. P. 65. *See Tran v. Luu*, No. 12-06-19,092-CV, 2014 Tex. App. LEXIS 3956 *6-7, 2014 WL 1410345 (Tex. App. -- Waco 2014, no pet.) ("by amending her pleading and eliminating her trespass, negligence, and nuisance claims, Tran effectively abandoned her trespass, negligence, and nuisance claims and, thus, waived any error concerning the trial court's action in granting summary judgment as to these claims."); *Kinney v. Palmer*, No. 04-07-00091-CV, 2008 Tex. App. LEXIS 4632 *7; 2008 WL 2515696 (Tex. App. – San Antonio 2008, no pet.) ("by amending their pleading and eliminating the DTPA, negligent misrepresentation, and fraud references, the Kinneys abandoned those claims and have waived any error concerning the trial court's action in granting Palmer's motion for partial summary judgment as to these claims.")

56

Accordingly, this Court need not address the trial court's summary judgment as to those claims on the merits.

**G.      The Trial Court Did Not Err in Granting Summary Judgment on Amerigroup's Equitable Claims Based on the Statute of Limitations.**

Because the alleged oral contract – even as described by Amerigroup's own witnesses – did not include a term requiring reimbursement of alleged overpayments, Amerigroup alleged equitable theories of unjust enrichment and money had and received to recover the alleged mistaken payments.

If this Court sustains the summary judgment based on the statute of frauds, lack of authority, or waiver defenses discussed above, it need not address Amerigroup's argument that the court erred in granting summary judgment on Amerigroup's equitable claims based on the statute of limitations.  If there is no enforceable agreement limiting payment to Medicaid rates then there has been no overpayment, and no cause of action for money had and received or unjust enrichment exists.

In any event, the court did not err in granting summary judgment on these claims based on the statute of limitations.

**1.      Unjust enrichment and money had and received are governed by the two-year statute of limitations.**

Both unjust enrichment and money had and received are governed by the 2 year limitations period for "taking or detaining the personal property of another." TEX. CIV. PRAC. & REM. CODE § 16.003(a).  They are not suits on a "debt"

57

governed by the 4 year statute of limitations in Tex. Civ. Prac. & Rem. Code § 16.004.

The Texas Supreme Court has held unequivocally that the statute of limitations for an unjust enrichment claim is two years:

> The most logical reading of sections 16.003 and 16.004 is to treat "debt" actions under section 16.004 as breach-of-contract actions that fall under the four-year statute of limitations for such claims, … while construing the two-year statute's reference to actions for "taking or detaining the personal property of another" as applicable to extra-contractual actions for unjust enrichment. This construction harmonizes the two statutes and gives meaning to each.

*Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 871-72 (Tex. 2007) (citations omitted).

Amerigroup does not appear to dispute the fact that its unjust enrichment claim is subject to the 2 year statute of limitations; its argument that the 4 year statute of limitations applies addresses only its money had and received claim. *See* Appellant's Br. at 51. Money had and received, however, is simply one legal theory for claiming unjust enrichment.[20] Significantly, every case Amerigroup cites for its argument that the 4 year statute applies to money had and received predates *Elledge*.

This Court has squarely held that the statute of limitations for money had and received claims is two years. *Merry Homes, Inc. v. Luc Dao*, 359 S.W.3d 881,

---

[20] *See Hancock v. Chicago Title Ins. Co.*, 635 F.Supp.2d 539, 560 (N.D. Tex. 2009) ("[U]njust enrichment is a theory of liability that a plaintiff can pursue through several equitable causes of action, including money had and received.") Thus, like any other theory for claiming unjust enrichment it falls within *Elledge*.

58

882 (Tex. App.-Houston [14th Dist.] 2012, no pet.). In doing so, this Court considered and rejected *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162 (Tex. App. – El Paso 1997, no pet.), the primary authority cited by Amerigroup, in light of the Supreme Court's later decision in *Elledge*. *See Merry Homes,* 359 S.W.3d at 884.

The most recent case Amerigroup cites for the proposition that the 4 year statute applies to money had and received is *Verizon Employee Benefits Committee v. Frawley*, No. 3:05-CV-2105-P ECF, 2007 WL 2051113 (N.D. Tex. 2007). After being made aware of the *Elledge* decision, however, that court reversed its own prior ruling and, like this Court, held that the 2 year statute of limitations applies. *Verizon Employee Benefits Committee v. Frawley*, 655 F.Supp.2d 644, 646 (N.D.Tex. 2008) ("In light of the recent Texas Supreme Court opinion which speaks to and likely resolves this issue, the split over the limitations period applicable to an action for money had and received should be resolved in favor of a two-year limitations period."). Thus the opinion relied on by Amerigroup is no longer good law.

### 2. The statute of limitations began to run when the money was paid.

Amerigroup's causes of action for unjust enrichment and money had and received accrued when Town Park received the alleged overpayments. *Tanglewood Terrace, Ltd. v. City of Texarkana,* 996 S.W.2d 330, 337 (Tex. App.-Texarkana 1999, no pet.); *Gaffar v. Kamal,* No. 05-10-00560-CV, 2011 Tex. App. LEXIS

59

5714, at \*6-7 (Tex. App.-Dallas July 27, 2011, no pet.). All of the payments at issue were received more than two years before suit was filed. Accordingly recovery is barred by the statute of limitations.

## IV. CONCLUSION AND PRAYER

Appellee True View Surgery Center, L.P. d/b/a Town Park Surgery Center respectfully requests that the judgment of the trial court be affirmed and that Town Park be granted such other relief to which it may be entitled.

Respectfully Submitted,

**STRASBURGER & PRICE, LLP**

By: /s/ Jack G. Carnegie
CHARLES "SCOTT" NICHOLS
State Bar No. 14994100
JACK G. CARNEGIE
State Bar No. 03826100
909 Fannin Street, Suite 2300
Houston, Texas 77010
Telephone: (713) 951-5600
Facsimile: (713) 951-5660
scott.nichols@strasburger.com
jack.carnegie@strasburger.com
ATTORNEYS FOR APPELLEE

2155944.4/SPH/27768/0101/103015

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with the rules governing the length of briefs prepared by electronic means. The brief was prepared using Microsoft Word 2013. According to the software used to prepare this brief, the total word count, including footnotes, but not including those sections excluded by rule, is 14,854. The brief was prepared using "Times New Roman" 14-point font.

/s/ Jack G. Carnegie
**JACK G. CARNEGIE**

61

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 30th day of October, 2015, a true and correct copy of the foregoing was forwarded to all known counsel of record via facsimile and e-mail in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure, as follows:

Ray T. Torgerson
David W. Salton
Joshua W. Wolfshohl
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6650
Facsimile: (713) 226-6250
rtorgerson@porterhedges.com
dsalton@porterhedges.com

/s/ Jack G. Carnegie
**JACK G. CARNEGIE**

62

2155944.4/SPH/27768/0101/103015